UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOANNE SANTIAGO,

Plaintiff,

- against -

NEW YORK UNIVERSITY LANGONE HOSPITALS,

Defendant.

**MEMORANDUM OPINION & ORDER**

22 Civ. 10061 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Joanne Santiago brings disability discrimination claims under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"), the New York State Human Rights Law, N.Y. Exec. L. § 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL") against Defendant New York University Langone Hospitals ("NYU Langone"). (Am. Cmplt. (Dkt. No. 26) ¶¶ 45-62)

The parties have cross-moved for summary judgment. NYU Langone seeks summary judgment on all claims (Dkt. No. 73), while Santiago seeks summary judgment as to her NYCHRL claims for (1) disability discrimination; and (2) failure to accommodate or engage in a cooperative dialogue. (Dkt. No. 74) Plaintiff has also moved to strike the declaration of Naomi Noble (Dkt. No. 81), which was submitted by Defendant with its reply brief.

For the reasons stated below, NYU Langone's motion for summary judgment (Dkt. No. 73) will be granted as to Plaintiff's claim for failure to engage in an interactive process under the NYSHRL, and will otherwise be denied. Santiago's motion for summary judgment

(Dkt. No. 74) will be granted as to her claim for failure to engage in a cooperative dialogue under the NYCHRL, and will otherwise be denied. The motion to strike (Dkt. No. 101) will be granted.

## BACKGROUND

## I. FACTS[1]

### A. Parties

Plaintiff Joanne Santiago is a registered nurse licensed to work in New York. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 112) She graduated from nursing school in May 2020. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 2)

Defendant New York University Langone is part of NYU Langone Health, an academic medical center based in New York City. (Id. ¶ 1) NYU Langone operates several medical facilities, including the "Tisch-Kimmel facility." (See Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 24)[2]

### B. Santiago Receives a Conditional Offer of Employment from NYU Langone

In September 2020, Santiago applied for a position as an intensive care unit ("ICU") staff nurse on NYU Langone's Nursing Resource Team. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 2) The Nursing Resource Team consists of twenty to thirty nurses that provide staffing on an as-needed basis to the inpatient units at NYU Langone's Tisch-Kimmel facility. (See id. ¶ 3)

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Unless otherwise stated, the facts cited by the Court are undisputed.

[2] Deposition page numbers refer to the pagination assigned by the court reporter. The page numbers of all other documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

The position that Santiago applied for is assigned to intensive care units treating adult patients. (Id. ¶¶ 2, 4)

Later in September – after submitting her application – Santiago was interviewed by Katherine Iseman, a Talent Acquisition Specialist at NYU Langone. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 113; Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 6) Santiago then had a second-round interview with Quyen Wong, who served as both the hiring manager for the position and the nurse manager of the Nursing Resource Team. (Id. ¶ 7) After interviewing Santiago, Wong instructed Iseman to offer the position to Santiago. (Id. ¶ 8)

On September 18, 2020, Iseman sent Santiago a written offer of employment for the staff nurse position. (Id. ¶ 9) The letter states that NYU Langone's offer of employment is subject to Santiago's satisfactory completion of "a pre-employment physical examination." (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 120)

## C. Santiago Discloses a Twenty-Pound Lifting Restriction

All those who are offered a nursing position at NYU Langone are required to undergo a pre-employment physical examination by NYU Langone's Department of Occupational Health Services. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 11) The purpose of the physical examination is to determine whether the applicant is fit to serve in the position for which they have received a job offer. (Id. ¶ 12; Collins Decl., Ex. 5 (Baniqued Dep.) (Dkt. No. 76-5) at 28-29)) In connection with the physical examination, applicants must complete a medical history questionnaire and discuss their responses with a Department of Occupational Health Services nurse practitioner. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶¶ 13-14)

On September 28, 2020, Santiago completed the medical history questionnaire. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 121) She reported on the questionnaire that she suffered

"ongoing medical conditions or disabilities." (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 16) Santiago did not explain the nature of her "ongoing medical conditions or disabilities" at that time. (See Collins Decl., Ex. 5 (Baniqued Dep.) (Dkt. No. 76-5) at 71 (explaining that Santiago provided information later regarding her disability))

On October 1, 2020, Raquel Baniqued – a Department of Occupational Health Services nurse practitioner – spoke by telephone with Santiago regarding her questionnaire responses. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 122) During this call, Santiago disclosed a "physical disability with regard to her neck" that prevented her from lifting more than twenty pounds. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 18) Santiago stated that her disability was caused by a workplace injury (id. ¶ 19), which had "resulted in cervical herniation and bulging discs in her neck."[3] (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 123) Baniqued scheduled a physical examination for Santiago at the Department of Occupational Health Services on October 6, 2020. (Id. ¶ 125)

### D. Internal Communications at NYU Langone Regarding Santiago's Weight-Lifting Restriction

After speaking with Santiago on October 1, 2020, Baniqued informed Iseman of Santiago's weight-lifting restriction and the workplace injury she had suffered. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 22) In an October 1, 2020 email, Iseman told Nurse Manager Wong that "'[t]here is an issue with Joanne Santiago ☹.'" (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 128 (quoting Buell Decl., Ex. 14 (October 1, 2020 email thread) (Dkt. No. 91-12) at 2))

---

[3] In October 2017, Santiago filed a workers' compensation claim concerning this injury. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 19) On May 6, 2020, a Workers' Compensation Law Judge found that Santiago had suffered "a class 2 severity A permanent impairment in the permanent spine," such that she was entitled to "250 weeks of benefits at the permanent partial disability minimum rate of $150.00 per week." (Buell Decl., Ex. 28 (August 19, 2020 Workers' Compensation Board Panel Decision) (Dkt. No. 91-30) at 5) A Workers' Compensation Board Panel later affirmed that dectermination. (Id.)

In an October 2, 2020 call, Iseman told Wong about Santiago's workplace injury and her weight-lifting restriction. (Id. at ¶ 129) Wong "expressed concerns about whether [Santiago] could safely perform the essential functions of an ICU Staff Nurse with a twenty-pound lifting restriction." (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 34; see also Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 130 (noting that Wong stated, "I don't know that we can move forward" (citation and quotation marks omitted)))

After speaking with Iseman, Wong sent an email to Scott Mellynchuk, an Employee & Labor Relations Manager at NYU Langone Health (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 131; see also Collins Decl., Ex. 6 (Mellynchuk Dep.) (Dkt. No. 76-6) at 15), with a cc to Iseman and Iseman's supervisor George Bruno, who served as NYU Langone Health's Director of Talent Acquisition for Nursing. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 131; see also Collins Decl., Ex. 7 (Bruno Decl.) (Dkt. No. 76-7) ¶ 1) Wong's October 2, 2020 email reads as follows:

> Per my conversation with Katherine [Iseman], Joanne's inability to lift great[er] than 20lbs would create a hardship for the department and would not be able to work on the Nursing Resource Team. Our [job description] requirement for nurses indicates that RNs for the inpatient units need[] to be able to lift a minimum of 22 pounds. At this time we will need to rescind the offer.

(Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 131 (citations and alterations omitted))[4] Mellynchuk responded that he "would like to have a discussion before we make a decision." (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 42 (citation and quotation marks omitted))

Mellynchuk later sent an email to Iseman and Bruno with draft language that could be included in a letter to Santiago rescinding her employment offer. (Collins Decl., Ex. 18

[4] At deposition, Wong admitted that the Nursing Resource Team's staff nurse job description does not contain a 22-pound weight-lifting requirement. (See Buell Decl., Ex. 6 (Wong Dep.) (Dkt. No. 91-4) at 77; Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 132 (citing Buell Decl., Ex. 17 (Job Description) (Dkt. No. 91-15) at 1))

(Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 6-7) Iseman then sent Mellynchuk and Bruno a "sample rescind letter." (Id.)

That evening, Mellynchuk, Wong, and Bruno spoke over a Webex call.[5] (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 43) During this call, Santiago's weight-lifting restriction was discussed. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 142) Wong stated that Santiago's weight-lifting restriction would prevent her from performing three responsibilities listed in the ICU staff nurse job description: (1) "'[i]mplement[ing] interventions in the coordination of patient care in a safe, timely, and appropriate manner'"; (2) "'[a]dher[ing] to patient care and nursing standards in care delivery'"; and (3) utilizing "'physical stamina . . . to perform responsibilities.'" (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 50 (first and third alterations in original) (quoting Collins Decl., Ex. 17 (Staff Nurse Job Description) (Dkt. No. 76-17) at 2-3)) Mellynchuk and Bruno agreed with Wong's assessment. (Id. ¶ 51)

During the call, Mellynchuk asked whether NYU Langone could reasonably accommodate Santiago's weight-lifting restriction. (Buell Decl., Ex. 27 (Mellynchuk Dep.) (Dkt. No. 91-25) at 103) A discussion then ensued as to whether Santiago's "[weight-]lifting restriction could be reasonably accommodated through delegation of duties or use of equipment that could assist in lifting." (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 52) Nurse Manager Wong maintained that there was no reasonable accommodation that would permit Santiago "to perform the essential functions of the ICU Staff Nurse position." (Id. ¶ 57) No one on the Webex call conducted "any inventory of NYU equipment (such as assistive machinery available for moving and transferring patients)" at that time (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 146), referred to "any documents or

[5] Webex is "an audio-based conferencing system." Bergamaschi v. Cuomo, No. 20 Civ. 2817 (CM), 2020 WL 1910754, at *17 (S.D.N.Y. Apr. 20, 2020) (citation omitted).

policies regarding applicable lifting restrictions for NYU nurses," or reviewed "any medical records relating to Santiago's disability or lifting restriction." (Id ¶¶ 146-47)

### E. Santiago States That She Can Lift Up to Thirty Pounds

On October 5, 2020, Santiago contacted Iseman to say that her actual weight-lifting restriction was thirty pounds and not twenty pounds. (Id. ¶ 150) Santiago also told Iseman that she had asked her neurologist to provide updated medical documentation regarding her weight-lifting restriction and neck condition. (Id. ¶ 151)

Later that day, Iseman sent Baniqued, Wong, Mellynchuk, and Bruno an email reporting on Santiago's revised weight-lifting restriction. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 60) Wong responded that "[t]here should be no weight restrictions" for an ICU staff nurse and that she "d[id] not wish to move forward with this candidate." (Id. ¶ 61 (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 5)) Bruno stated that he would "defer to Scott [Mellynchuk]" but that he did not "believe [that NYU Langone] can just state [it] [is] not interested in moving forward because she has a weight restriction." (Id. ¶ 62 (first alteration in original) (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 4)) Bruno went on to say that "if [Santiago] does have a weight restriction, then I don't believe 30 pounds would allow her to do this job." (Id.)

Mellynchuk asked Wong to address the burden that a thirty-pound weight restriction would place on the ICU nursing team:

> We should only rescind if the restriction will cause an undue burden to the service, considering impact to patient care and other co-workers. Quyen [Wong], would you please advise if a 30- pound restriction would cause similar issues to those discussed on Friday[,] [October 2, 2020]? If it will cause a hardship, we can reiterate the offer is rescinded on the same basis.

(Id. ¶ 64 (first alteration in original) (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 4))

Wong replied as follows:

> Yes, it is a hardship, as stated before, patient[s] need to be turned and positioned, and for her own safety as well as the patient in the event the patient falls or is about to fall and she has to ease the patient to the ground, that will surpass the 30 pound restriction.

(Id. ¶ 65 (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 3)) Mellynchuk responded that he agreed with Wong, and supported rescinding Santiago's offer on that basis. (Id. ¶ 66)

While Bruno also voiced agreement with this approach, he stated that NYU Langone would "need [Santiago] to go to [the Department of Occupational Health Services] and get the official documentation with her restrictions" before NYU Langone could officially rescind the offer. (Id. ¶ 67 (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 3))

On October 6, 2020, Nurse Practitioner Baniqued conducted a physical examination of Santiago. (Id. ¶ 69) During the examination, Santiago reiterated that she had a cervical disc herniation and bulging discs that resulted from a work-related injury, and that this condition prevented her from lifting more than thirty pounds. (Id.; Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 160) Baniqued then asked Santiago whether she "believed she could perform '[the] duties [of the ICU nurse position] with or without an accommodation' and [Santiago] responded 'yes[.]'" (Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 161 (second and third alterations in

original) (quoting Collins Decl., Ex. 29 (Santiago Dep.) (Dkt. No. 89-1) at 186-87)) Baniqued then told Santiago to submit a medical clearance note from her neurologist. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 70)

After the examination, Santiago emailed Baniqued two redacted pages of an August 18, 2020 memorandum issued by the Workers' Compensation Board. (See id. ¶ 71-72 (citing Collins Decl., Ex. 19 (Oct. 6, 2020 email thread and attachment) (Dkt. No. 76-19) at 2-4)) The memorandum indicates that Santiago had requested "administrative review of a decision issued by a Workers' Compensation Law Judge . . . filed on May 6, 2020." (Collins Decl., Ex. 19 (Oct. 6, 2020 email thread and attachment) (Dkt. No. 76-19) at 2-3) The memorandum further states that the Workers' Compensation judge had (1) determined that the credible medical evidence "supported a finding of a class 2 severity A impairment of the cervical spine"; and (2) "credit[ed] [a physician's] finding that [Santiago] could not lift weight in excess of 30 pounds."[6] (Id.) Baniqued then asked Santiago to obtain "more current" documentation concerning her condition. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 73 (citation and quotation marks omitted))

### F. Defendant Rescinds its Offer of Employment

On October 7, 2020, Iseman sent Baniqued and Bruno an email requesting "an update on Joanne Santiago at [their] earliest convenience." (Collins Decl., Ex. 20 (Oct. 7, 2020 Email Thread) (Dkt. No. 76-20) at 3) Baniqued responded that she had conducted "a pre-employment exam" the day before, and had asked Santiago to obtain updated medical documentation regarding her condition. (Id.) Baniqued also reported that Santiago had (1)

---

[6] During discovery, Magistrate Judge Ona Wang ordered Santiago to provide her Workers' Compensation Board file to NYU Langone. (See Dkt. No. 38) The Workers' Compensation file revealed that Santiago had redacted language in previously produced discovery material stating that "there were some items that she could not lift above 20 pounds." (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶¶ 89, 93)

submitted a "letter from the NYS Worker's Compensation Board" stating she could not lift more than thirty pounds; and (2) was "trying to get an appointment with her neurologist" for the coming week and would "update [Baniqued] on the outcome." (Id.)

Bruno forwarded Baniqued's email to Mellynchuk, Iseman, and Wong. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 76) Bruno remarked that he did "not know if/when [Santiago] will get an appointment that may change the lifting restriction," and he asked whether NYU Langone should rescind Santiago's offer based on the documentation already provided. (Collins Decl., Ex. 8 (Oct. 7, 2020 email thread) (Dkt. No. 76-8) at 4) Mellynchuk responded by asking the group whether there were other candidates who were "lined up" for the position. (Id. at 3) Wong replied that, "We are very short staff[ed], and need to fill our positions quickly, [as] delays to our nursing budgets will affect patient care." (Id.) Mellynchuk then asked "how much time" NYU Langone typically gives prospective employees "to provide other information relevant to the hiring process," such as "copies of transcripts, prior employment verification," and "certifications." (Id.) Bruno explained that

> [m]ost of those things are verified right at acceptance. I am fine if we give a deadline, just don't want to get into a situation where we wait for two weeks and then rescind the offer and cannot have someone start until December because of the way nursing orientation falls.
>
> My recommendation would be to give her till Friday[,] [October 9, 2026,] to produce documentation on any restrictions to [the Department of Occupational Health Services].

(Id. at 2) Mellynchuk wrote that that deadline "sound[ed] reasonable." (Id.)

Later that day, Santiago told Baniqued that "the earliest appoint[ment] she could obtain with her neurologist" was on October 27, 2020. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 83) Baniqued gave this update to Iseman and Bruno, noting that – in light of this schedule – the Department of Occupational Health Services would not be able to "grant [Santiago] medical

clearance in time for her original start date of 10/12." (Id. ¶ 82 (citation and quotation marks omitted)) Mellynchuk then asked whether NYU Langone generally "delay[s] hiring in other scenarios where the need is urgent and [it] ha[s] other candidates in line." (Collins Decl., Ex. 22 (Oct. 7, 2020 email thread) (Dkt. No. 76-22) at 2) In the event such a delay was not typical, Mellynchuk proposed rescinding Santiago's offer. (Id. (advocating for rescission "for the reasons [they] previously discussed")) Bruno agreed that NYU Langone "should rescind using the verbiage [Mellynchuk had previously] provided," except that the rescission letter should be updated to reflect Santiago's representation that she could lift up to thirty pounds. (Id.)

Within the hour, Iseman informed Santiago that NYU Langone would be rescinding her employment offer. (Collins Decl., Ex. 20 (Oct. 7, 2020 email thread) (Dkt. No. 76-20) at 2) Iseman sent Santiago a formal recission letter a short time later. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 176) In the rescission letter, Iseman wrote that,

> [d]uring our discussion about your candidacy, you indicated that you are not able to lift more than 30 pounds due to medical restrictions. After careful review and consideration, we are unable to accommodate this restriction. Lifting, pushing, and carrying patients and heavy equipment is an essential function of the Staff Nurse position that cannot be removed or delegated to other roles without impairing service to our patients. For this reason, we must respectfully rescind our offer of employment. In the event circumstances change, you are welcome to reapply.

(Collins Decl., Ex. 23 (Rescission Letter) (Dkt. No. 76-23) at 2)

It is undisputed that, "[a]t no time prior to its recission of Santiago's offer of employment[,] did anyone at NYU [Langone] – including Bruno, Wong, Iseman, or Mellynchuk – discuss with Santiago or any medical provider for Santiago, potential accommodations of her disability that could enable her to perform her responsibilities." (See Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 179)

## II. PROCEDURAL HISTORY

The Complaint was filed on November 28, 2022 (Dkt. No. 1), and the Amended Complaint was filed on April 14, 2023. (Am. Cmplt. (Dkt. No. 26))

The Amended Complaint asserts claims against NYU Langone for disability discrimination in violation of the ADA, the NYSHRL, and the NYCHRL. (Id. ¶¶ 45-47; 51-53; 57-59) The Amended Complaint also asserts separate claims for (1) "failure to accommodate" under the ADA, (2) "failure to accommodate or engage in the interactive process" under the NYSHRL, and (3) "failure to accommodate or engage in a cooperative dialogue" under the NYCHRL. (Id. ¶¶ 48-50, 54-56, 60-62) (capitalization removed))

On May 17, 2024, the parties cross-moved for summary judgment. (Dkt. Nos. 73-74) Defendant NYU Langone seeks summary judgment on all of Santiago's claims (Dkt. No. 73), while Santiago has moved for summary judgment on her NYCHRL claims. (Dkt. No. 74)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine issue' exists and summary judgment is therefore improper 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'" Lucente v. County of Suffolk, 980 F.3d 284, 296 (2d. Cir. 2020) (quoting Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)). "When no rational jury could find in favor of the nonmoving party because the evidence to support [his] case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential

Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credits all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . Mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation, quotation marks, and alterations omitted). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . . ." Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citations omitted).

"In cases involving claims of discrimination or retaliation, 'an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions.'" Ball v. Marriott Int'l, Inc., 627 F. Supp. 3d 296, 312 (S.D.N.Y. 2022) (alterations in original) (citations and quotation marks omitted). "However, 'the salutary purposes of summary judgment – avoiding protracted, expensive[,] and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.'" Cherry v. N.Y.C. Hous. Auth., 564 F. Supp. 3d 140, 163 (E.D.N.Y. 2021) (omission in original) (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).

As in any other case, "an employee asserting employment discrimination or retaliation 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'must come forth with evidence sufficient to allow a reasonable jury to find in [her] favor.'" Zurich Am. Life Ins. Co. v. Nagel, 590 F. Supp. 3d 702, 734 (S.D.N.Y. 2022) (quoting Brown, 257 F.3d at 252). "'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and] 'must offer some hard evidence showing that [her] version of the events is not wholly fanciful.'" Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (first quoting Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008); then quoting Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Jeffreys, 426 F.3d at 553-54 (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

**B. Disability Discrimination**

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). It is well established that discrimination under the ADA includes an employer's refusal to hire a qualified applicant on the basis of a disability. See, e.g., Katz v. Adecco USA, Inc., 845 F. Supp. 2d 539, 547 (S.D.N.Y. 2012) (addressing "claims of discriminatory hiring" under the ADA); Hall v. N.Y.C. Dep't of Educ., No. 23-CV-10385 (JGK), 2024 WL 4979288, at *10 (S.D.N.Y. Dec. 3, 2024) (observing that "the ADA makes it unlawful for an employer to discriminate in hiring decisions" (citing 42 U.S.C. § 42 U.S.C. 12112(a)).

Claims alleging disability discrimination in violation of the ADA are subject to the three-step burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Programs, Inc., 198 F.3d 68, 72 (2d Cir. 1999). Under the McDonnell Douglas framework, "[a] plaintiff must [first] establish a prima facie case [of discrimination]; [second,] the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and [third] the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citation omitted).

An ADA disability discrimination claim may proceed under a variety of legal theories, including "disparate treatment" and "failure to make a reasonable accommodation." See Davis v. Shah, 821 F.3d 231, 260 (2d Cir. 2016) (citing Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009)).

An ADA plaintiff who proceeds on a theory of disparate treatment must show that "'(1) [the] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the

ADA; (3) [s]he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [s]he suffered [an] adverse employment action because of [her] disability.'" Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019) (quoting McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013)). To demonstrate that she suffered an "adverse employment action because of [her] disability" under a disparate treatment theory, id., plaintiff must offer evidence that she was treated less favorably than individuals without the alleged disability who were otherwise "'similarly situated in all material respects.'" See Roggenbach v. Touro Coll. of Osteopathic Med., 7 F. Supp. 3d 338, 345 (S.D.N.Y. 2014) (quoting Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).

An ADA plaintiff who alleges discrimination under a theory of failure to accommodate "must establish that: '(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" See Tafolla v. Heilig, 80 F.4th 111, 118-19 (2d Cir. 2023) (quoting McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009)).

Disability discrimination claims under the NYCHRL are governed by a standard more favorable to plaintiffs. See Piligian v. Icahn Sch. of Med. at Mount Sinai, 490 F. Supp. 3d 707, 717 (S.D.N.Y. 2020) (citing Cain v. Esthetique, 182 F. Supp. 3d 54, 71 (S.D.N.Y. 2016)). NYCHRL claims for disability discrimination involve the same elements as ADA disability discrimination claims, "except that the standard under the NYCHRL is 'broader' and 'the NYCHRL directs that the plaintiff's qualification for the position is not an element of a prima facie case.'" See Owens v. City of N.Y. Dep't of Educ., No. 21-2875, 2022 WL 17844279, at *1

(2d Cir. Dec. 22, 2022) (summary order) (quoting Williams v. MTA Bus Co., 44 F.4th 115, 137 (2d Cir. 2022)).

Prior to August 12, 2019, claims of disability discrimination under the NYSHRL were "analyzed under the same standard used for ADA discrimination claims." See Piligian, 490 F. Supp. 3d at 716 (citations omitted); see also Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."). The NYSHRL "'was amended in 2019 to align with the NYCHRL's more liberal pleading standard,'" however. Edelman v. NYU Langone Health System, 141 F. 4th 28, 45 n.9 (2d Cir. 2025) (quoting Qorrolli v. Metro. Dental Assocs., 124 F.4th 114, 122-23 (2d Cir. 2024)). "'As a result of the amendment, the NYSHRL now aligns with the standards of the [NYCHRL].'" Martinez v. Staten Island University Langone, 814 F. Supp. 3d 380, 401 (E.D.N.Y. 2026) (alteration in original) (first quoting Wright v. White Plains Hosp. Med. Ctr., 237 A.D. 3d 1143, 1145 (2d Dept. 2025); then citing Edelman, 141 F. 4th at 45 n.9).

## II. PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS

As discussed above, Defendant NYU Langone has moved for summary judgment on all of Plaintiff's disability discrimination claims (Def. Sum. J. Br. (Dkt. No. 78) at 19-33) – whether brought under the ADA, the NYSHRL, or the NYCHRL – while Plaintiff has cross-moved only on her NYCHRL disability discrimination claims. (Pltf. Sum. J. Br. (Dkt. No. 75) at 12-29)

In the Amended Complaint, Plaintiff claims that Defendant violated all three anti-discrimination statutes by rescinding her offer of employment on account of her disability; by failing to provide accommodations for her disability; and by failing to engage in an interactive

process and/or cooperative dialogue with Santiago regarding her disability. (Am. Cmplt. (Dkt. No. 26) ¶¶ 46, 49, 52, 55, 58, 61)

### A. The Parties' Arguments

In moving for summary judgment on Santiago's disability discrimination claim premised on disparate treatment, NYU Langone does not dispute that it "'is subject to the ADA,'" the NYSHRL, and the NYCHRL; that Santiago "'was disabled within the meaning of the ADA'"; or that she "'suffered [an] adverse employment action because of [her] disability.'" (See Def. Br. (Dkt. No. 78) at 20 (alterations in original) (quoting Heiden v. N.Y.C. Health & Hosps. Corp., No. 20-CV-10288 (LJL), 2023 WL 171888, at *15 (S.D.N.Y. Jan. 11, 2023) (referencing these elements but disputing only whether Santiago was qualified for the ICU staff nurse position)))

Similarly, for purposes of Plaintiff's disability discrimination claim premised on a failure to accommodate, NYU Langone does not dispute that Santiago "'is a person with a disability under the meaning of the ADA'"; that NYU Langone "'had notice of her disability'"; and that NYU Langone "'refused to make [any] accommodations.'" (Id. at 27 (citations omitted) (recounting these elements but asserting only that Santiago "cannot establish the availability of a reasonable accommodation")); see also Tafolla, 80 F.4th at 118 (a plaintiff must proffer evidence of each of these elements to establish a failure to accommodate (citing McBride, 583 F.3d at 97)).

For purposes of both Plaintiff's disparate treatment and failure to accommodate claims, however, Defendant contends that Santiago was not qualified to "'perform the essential functions'" of the ICU staff nurse position, with or without an accommodation. (See Def. Sum. J. Br. (Dkt. No. 78) at 19-23); see also Fox, 918 F.3d at 71 (quoting McMillan, 711 F.3d at 125) (disparate treatment); Tafolla, 80 F.4th at 118 (quoting McBride, 583 F.3d at 97) (failure to

accommodate). According to Defendant, "Plaintiff's lifting restriction rendered her unqualified to perform certain non-delegable, essential functions of the ICU Staff Nurse role." (Def. Sum. J. Br. (Dkt. No. 78) at 22)

NYU Langone also moves for summary judgment on Santiago's disability discrimination claims based on two affirmative defenses. First, it asserts that Santiago's lifting restriction "imposed a direct threat to the health and safety of others." (Id. at 23-27 (citing, inter alia, Makinen v. City of New York, 53 F. Supp. 3d 676, 693 (S.D.N.Y. 2014)) Second, NYU Langone contends that the only available accommodations – requiring co-workers to assist Santiago in lifting patients or heavy items and authorizing the use of assistive equipment – would have posed an "undue hardship." (See id. at 27-30 (citing, inter alia, Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016))

Santiago responds that "the record evidence . . . establishes that [she] could perform the functions of the [ICU staff] nursing position" (Pltf. Sum. J. Br. (Dkt. No. 75) at 19-20); that there is "no evidence" that her weight-lifting restriction posed a "direct threat" to patient safety (id. at 22; see also Pltf. Opp. (Dkt. No. 96) at 24-27 ("NYU [Langone] has failed to offer any objective, relevant evidence to support its direct threat defense to Santiago's disability discrimination claims.")); and that Defendant has not shown that "its refusal to accommodate Santiago's disability is due to undue hardship." (Pltf. Sum. J. Br. (Dkt. No. 75) at 25 (citation omitted))

The Court addresses each of these arguments in turn.

### B. Whether Santiago Was Qualified to Perform the Job's Essential Functions

NYU Langone contends that it is entitled to summary judgment because Santiago "cannot demonstrate that she was able to perform the essential functions of an ICU Staff Nurse

with or without an accommodation." (Def. Sum. J. Br. (Dkt. No. 78) at 20-22) According to Defendant, "[t]he essential functions of a Staff Nurse on the Nursing Resource team in the ICU include lifting, maneuvering, and manipulating adult ICU patients and certain heavy equipment," and "Plaintiff's lifting restriction rendered her unqualified to perform" these essential functions. (Id. at 21-22)

Santiago argues, however, that there is "no evidence establishing that [her] lifting restriction rendered her incapable of performing the essential functions of the [ICU staff nurse] role." (Pltf. Sum J. Br. (Dkt. No. 75) at 20)

**1. Applicable Law**

To make out a prima facie case of disability discrimination under the ADA – whether proceeding under a disparate treatment or failure to accommodate theory of liability – a plaintiff must establish that she was "qualified to perform the essential functions of the job." Baker v. Bridge Inc., 805 F. Supp. 3d 521, 546 (S.D.N.Y. 2025) (citation omitted). Under the ADA, "essential functions" refers to the "'fundamental' duties to be performed in the position in question." Stone v. City of Mt. Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1)).[7] "An analysis of whether [a plaintiff] is qualified to perform the essential

[7] The Second Circuit cases interpreting the phrase "essential functions" rely on regulations issued by the Equal Employment Opportunity Commission ("EEOC"). See, e.g., Stone, 118 F.3d at 97 (citing 29 C.F.R. § 1630.2(n)(1)). Neither side in this case has argued that this Court should disregard these Second Circuit precedents in light of Loper Bright Enters. v. Raimando, 603 U.S. 369 (2024).

In Loper Bright, the Supreme Court instructs that courts must "independently interpret [] statute[s] and effectuate the will of Congress," rather than defer to agency interpretations of statutes. Id. at 395. Loper Bright also states, however, that it is not intended to "call into question prior cases" that defer to agency interpretations of statutes, and that such cases "are still subject to statutory stare decisis despite [the] change in interpretative methodology." Id. at 412; see also Hinds v. Bondi, No. 24-1878, 2026 WL 122480, *1 (2d Cir. Jan. 16, 2026) (noting that the Second Circuit has "generally concluded that 'Loper Bright provides no basis for us to disregard'

functions of her position[] requires the Court to determine (1) what functions were essential to her position and (2) whether she was qualified to perform these functions[]" with or without reasonable accommodation. Martinez, 814 F. Supp. 3d at 403 (citing McMillan, 711 F.3d at 125).

NYSHRL and NYCHRL disability discrimination claims also turn on whether plaintiff can "perform the essential functions of the job." See Williams, 44 F.4th at 137. Unlike under the ADA, however, for purposes of disability discrimination claims brought under the NYSHRL and the NYCHRL, the burden of proof rests with the employer to show that plaintiff was not qualified to perform these functions. Id. (discussing burden of proof under the NYCHRL); see also Martinez, 814 F. Supp. 3d at 403 (noting that "the NYSHRL now aligns with the standards of the [NYCHRL]" (citations and quotation marks omitted)).

"Although a court will give considerable deference to an employer's determination as to what functions are essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions." McMillan, 711 F.3d at 126. In addition to the employer's views, these factors include "[w]ritten job descriptions," "[t]he amount of time spent on the job performing the function," any mention of the function in "a collective bargaining agreement," "[t]he work experience of past incumbents in the job," and the "current work experience of incumbents in similar positions." Stone, 118 F.3d at 97 (citation omitted).

---

precedent that relied on Chevron deference" (quoting Garcia Pinach v. Bondi, 147 F.4th 117, 121 (2d Cir. 2025)).

Here, both Plaintiff and Defendant have cited to Second Circuit cases that rely on EEOC regulations. (E.g., Pltf. Sum. J. Br. (Dkt. No. 75) at 24-25 (citing Stone, 118 F.3d at 97); Def. Sum. J. Br. (Dkt. No. 78) at 29 (citing Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 139 (2d Cir. 1995))) Given the case law discussed above, this Court will do the same.

"[U]ltimately, the question [of] whether a task constitutes an essential function depends on the totality of the circumstances." Rodal, 369 F.3d at 120 (citation omitted). "Usually no one listed factor will be dispositive." Stone, 118 F.3d at 97. And the Second Circuit has cautioned that courts must avoid deciding cases based on "unthinking reliance on intuition about the methods by which jobs are to be performed." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 140 (2d Cir. 1995). Court must instead conduct "a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." Id. (citation omitted).

**2. Analysis**

NYU Langone argues that it is entitled to summary judgment because (1) "[t]he essential functions of a[n] [ICU] Staff Nurse . . . include lifting, maneuvering, and manipulating adult ICU patients and certain heavy equipment"; and (2) "Plaintiff's lifting restriction rendered her unqualified to perform" these essential functions. (Def. Sum. J. Br. (Dkt. No. 78) at 21-22; see id. at 22 ("Plaintiff's lifting restriction rendered her unqualified to perform certain non-delegable, essential functions of the ICU Staff Nurse role."))

In making this argument, Defendant relies primarily on the deposition testimony of Nurse Manager Wong.[8]

---

[8] In connection with its reply brief in support of its motion for summary judgment, NYU Langone submitted a declaration from Naomi Noble, a "Clinical Resource Nurse within the Medical ICU at Tisch Langone." (Dkt. No. 81) Plaintiff has moved to strike the declaration, because it was submitted in connection with Defendant's reply brief. (Dkt. No. 101)

"Generally, a court will not consider evidence and arguments raised for the first time in a reply brief, especially without a reasonable explanation as to why this information could not have been addressed in the party's initial filing." Allco Fin. Ltd. v. Roisman, No. 2:20-CV-103, 2020 WL 6150971, at *2 (D. Vt. Oct. 20, 2020) (citing McBride, 583 F.3d at 96). Here, Defendant contends that Santiago "claimed for the first time [– in her opposition to Defendant's summary judgment motion –] that the need to catch falling patients is 'not included in the experience of

While acknowledging that NYU Langone has no formal or informal policy requiring that nurses have the capacity to lift a certain amount of weight (Buell Decl., Ex. 6 (Wong Dep.) (Dkt. No. 91-4) at 76-77), Wong maintains that Santiago's weight-lifting restriction – in the context of work in the ICU – presents a risk to both patient safety and to Santiago herself. (Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 140-41, 198; see also id. at 164 (stating that Santiago's weight-lifting restriction raised "patient care concerns"); Collins Decl., Ex. 30 (Wong Dep.) (Dkt. No. 89-2) at 133 ("[A] 20-pound weight restriction made me concerned that would pose a risk to patient care.")) Wong notes that ICU nurses care for critically ill patients who often cannot move on their own. They are often sedated and may be intubated. The patients need help turning over and positioning themselves in bed, and they need help getting out of bed. Emergencies also happen more frequently in the ICU because the patients are critically ill. (Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 126, 128; see also Baniqued Dep. (Dkt. No. 76-5) at 80 (noting that many ICU patients must be helped out of bed

---

past or current employees in a similar position.'" (Def. Opp. to Mot. to Strike (Dkt. No. 102) at 2 (quoting Pltf. Opp. (Dkt. No. 96) at 17)) According to Defendant, this argument by Plaintiff led it to "learn[] of Ms. Noble's identity and discover[] that her experience as an ICU Staff Nurse directly undermines Plaintiff's argument that the ability to lift in excess of 30 pounds is not an essential requirement for the job." (Id. at 2)

Defendant argued in its moving brief, however, that "Staff Nurses are responsible for administering urgent care to patients which, among other interventions, may require a Nurse to ease a falling adult to the ground under unpredictable circumstances." (Def. Sum. J. Br. (Dkt. No. 78) at 17) Defendant also highlights in its moving brief Wong's testimony that "if a patient was falling and [a nurse] need[ed] to catch the patient and lower them to the floor, that would be over a 20-pound requirement because these are ICU adult patients." (Id. at 10 (quoting Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 38))

Accordingly, Defendant was well aware – when it filed its moving brief – that the capacity of ICU staff nurses to catch falling patients was an issue in this case. Accordingly, the Noble declaration should have been submitted in connection with Defendant's moving brief and not in connection with Defendant's reply. Santiago's motion to strike the Noble declaration (Dkt. No. 101) will therefore be granted.

and assisted when they fall; many are "dead weight . . . a lot of them are vented. They can't move for themselves. They're sedated.")) Patient falls are not infrequent in the ICU, and ICU nurses must have the physical capacity to keep a patient from falling, and to catch them if they begin to fall. (Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 140-42) A nurse working with a weight-lifting restriction may not be able to assist a patient who is falling, or may injure herself if she attempts to keep the patient from falling. (Id.)

Wong further states that ICU nurses must have the capacity to bear a patient's weight, because they are frequently called upon to assist patients in getting out of bed and – for example – helping them to a chair or to the bathroom. If a patient's knees buckle as the nurse assists the patient in moving from a hospital bed to a chair or to the bathroom, the nurse must have the capacity to bear the patient's weight and keep them from falling – or at least break or ease their fall. (Id. at 122, 140-41, 150-51, 196) A nurse working under a weight lifting restriction may not have the capacity to bear a patient's weight, or may injure herself if she does. (Id. at 140-41) And while NYU Langone has "assistive equipment" available to help nurses who are moving non-ambulatory patients, ICU nurses are sometimes called upon to lift or bear the weight of patients in "emergent situations," and "emergencies . . . can happen where equipment cannot be easily brought to the bedside right away." (Id. at 66) "Lifting, pushing, and carrying heavy equipment is [also] an essential function of the [ICU] staff nurse position that cannot be removed or delegated to other roles without impairing service to [other] patients." (Id. at 149)

The problem with Wong's testimony is that much of it addresses the need for ICU nurses to have the capacity to bear a patient's weight. Santiago is subject to a twenty- or thirty-pound weight-lifting restriction, however, and it is not clear from the record how Santiago's weight-lifting restriction would affect her ability to temporarily bear the weight of a patient –

whether during a move from a hospital bed to a chair or the bathroom, or to prevent or ease a fall while the patient is ambulating. The Court concludes that there are material issues of fact as to whether Santiago was qualified for the ICU staff nurse position.

As to Santiago's cross-motion for summary judgment on her NYCHRL disability discrimination claim, Santiago contends that the record demonstrates that she "could have performed the job with a reasonable accommodation." (See Pltf. Sum. J. Br. (Dkt. No. 75) at 20) But Santiago has not demonstrated as a matter of law that she was qualified for the ICU staff nurse position.

As discussed above, the ICU treats critically ill patients who are often completely or partially non-ambulatory. "Emergent situations" are common in the ICU, given the critically ill condition of many of the patients. While Santiago would have nursing co-workers in the ICU, and while NYU Langone has assistive equipment available to help nurses move patients, emergency situations arise in which it may not be possible to quickly obtain the assistance of a co-worker or utilize assistive equipment. Given Santiago's twenty- or thirty-pound weight-lifting restriction, it is not clear that she could provide one-on-one patient care in an emergency situation that would be adequate to ensure the safety of both the patient and Santiago herself.[9]

---

[9] In her declaration, Santiago states that she worked as a staff nurse in the Emergency Department at Bellevue Hospital. (Santiago Decl. (Dkt. No. 92) ¶ 31) According to Santiago, she was not required to lift patients or machinery by herself as a staff nurse at Bellevue[,] and when she was required to "lift, reposition, or move patients, even in emergency situations, [she] follow[ed] established protocol by working with other healthcare personnel . . . and/or assistive machinery to do so." (Id. ¶ 33) Santiago further asserts that her "disability-related lifting restriction [has] not [been] an impediment in [her nursing] roles." (Id. ¶ 32) This evidence does not demonstrate as a matter of law that Santiago was qualified for the ICU staff nurse position, however. The level of care provided to patients in a hospital emergency room is not the same as the level of care necessary for critically ill patients in the ICU of a major hospital such as NYU Langone.

Accordingly, Santiago's cross-motion for summary judgment on her NYCHRL disability discrimination claim will be denied.

### C. Direct Threat

NYU Langone argues that it is entitled to summary judgment on Santiago's disability discrimination claims because it "reasonably concluded that Plaintiff's lifting restriction posed a direct threat to patient safety, as well as to the Plaintiff herself." (Def. Sum. J. Br. (Dkt. No. 78) at 23-27 (citing Def. R. 56.1 Stmt. (Dkt. No. 77) ¶¶ 24-26, 29-32, 40, 51, 65-66))

#### 1. Applicable Law

"[A]n employer may defend itself against an ADA claim by demonstrating that its employee [or applicant] would 'pose a direct threat to the health or safety of other individuals.'" Nelson v. City of New York, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *10 (S.D.N.Y. Aug. 19, 2013) (quoting 42 U.S.C. § 12113(b)). The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "The Second Circuit does not appear to have spoken directly" to the issue of which side bears the burden of proof as to whether employing the plaintiff would present a "direct threat" to the safety of others for purposes of an ADA claim. Nelson, 2013 WL 4437224, at *9 (citing Hargrave v. Vermont, 340 F.3d 27, 35 (2d Cir. 2003)).

Under the ADA, to demonstrate that an employee's disability presents a direct threat to others that cannot be eliminated by a reasonable accommodation, "the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk." Makinen, 53 F. Supp. 3d at 694 (citation and quotation marks omitted). Courts assessing whether an employee's disability poses such a risk of harm "consider factors such as '(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential

harm will occur; and (4) the imminence of the potential harm.'" Umanzor v. N.Y.C. Police Dep't, No. 14-CV-9850 (VSB), 2018 WL 840084, at *5 (S.D.N.Y. Feb. 12, 2018) (quoting Sista, 170 F. 3d at 169 (quoting 29 C.F.R. § 1630.2(r))).

Similarly, under the NYSHRL, "[r]easonable accommodation is not required where the disability or the accommodation itself poses a direct threat." N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(g)(2). New York state regulations define "direct threat" as "a significant risk of substantial harm to the health or safety of the employee or others that cannot be eliminated or reduced by reasonable accommodation." Id. § 466.11(g)(2)(i). To assert this defense under the NYSHRL, an employer must show that it "ma[d]e an individualized assessment to determine whether a direct threat exists, based on reasonable judgment that relie[d] on current medical knowledge or on the best available objective information." Mobley v. Madison Square Garden LP, No. 11 Civ. 8290 (DAB), 2012 WL 2339270, at *4 (S.D.N.Y. June 14, 2012) (citing N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(g)(2)(ii)).

NYU Langone has not cited case law demonstrating that an employer may assert a direct threat defense under the NYCHRL. Mobley v. Madison Square Garden LP – the only case cited by Defendant that involves a NYCHRL claim – finds merely that the NYSHRL authorizes a direct threat defense; it makes no such finding as to NYCHRL claims. See Mobley, 2012 WL 2339270, at *4 (citing N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(g)(2)).

Accordingly, the Court considers below whether Defendant has established as a matter of law its direct threat defense under the ADA and the NYSHRL.

**2. Analysis**

NYU Langone argues that it is entitled to summary judgment because Santiago's disability posed a direct threat to patient safety, in that Santiago's weight-lifting restriction

"could result in serious harm in the event that she was unable to assist a critically ill patient at a time of need." (Def. Sum. J. Br. (Dkt. No. 78) at 24-25)

According to Defendant, ICU nurses must "respond to emergent situations that may require the ability to move, lift, or absorb a certain amount of weight on a moment's notice," such as "when a patient is suddenly about to fall." (Id. at 25-26; see also Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 67 (testifying that emergencies are common at NYU Langone's ICU, and that co-workers and assistive equipment may not be immediately available)) Defendant argues that Santiago's weight-lifting restriction posed a direct threat to ICU patient safety because she would not be able to assist "a patient [who] was falling," and could not "catch the patient and lower them to the floor." (Def. Sum. J. Br. (Dkt. No. 78) at 11, 25-26 (citations omitted); Collins Decl., Ex. 2 (Wong Dep.) (Dkt. No. 76-2) at 122)

As discussed above, however, it is not clear how Santiago's weight-lifting restriction bears on her ability to temporarily bear the weight of a patient who is falling or who needs assistance getting out of bed, going to the bathroom, or walking the hall. There are also material issues of fact as to whether Santiago's disability presented a "substantial" risk of "significant harm" to patients or to herself. See Makinen, 53 F. Supp. 3d at 694 (an employer must show a "substantial" risk of "significant harm" to establish a direct threat defense).

For example, Santiago has offered evidence that patient falls are quite rare. Indeed, Santiago states that she has "never witnessed a patient fall" in her years as a nurse. (Santiago Decl. (Dkt. No. 92) ¶ 34) Santiago also maintains that "proper training and precautionary measures . . . make patient falls unlikely." (Id. ¶ 35) By contrast, Wong testified that NYU Langone's ICU saw patients fall between ten and twenty times between 2018 and 2020. (Buell Decl., Ex. 6 (Wong Dep.) (Dkt. No. 91-4) at 99-100)

To the extent that Defendant's motion for summary judgment is premised on its "direct threat" defense, the motion will be denied. The Court concludes that there are material issues of fact as to this issue.

**D. Undue Hardship**

NYU Langone argues that it is also entitled to summary judgment because Santiago's proposed accommodations "of delegating some of [her] duties [to co-workers] and employing lifting equipment posed an undue hardship." (Def. Sum. J. Br. (Dkt. No. 78) at 29-30)

**1. Applicable Law**

The ADA, the NYHSRL, and the NYCHRL all provide that an employer is not required to provide a proposed accommodation if that accommodation would cause an "undue hardship." See McMillan, 711 F.3d at 128 (ADA); Jacobsen v. N.Y.C. Health & Hosps. Corp., 22 N.Y.3d 824, 834-35 (2014) (NYSHRL and NYCHRL), superseded in part by statute on other grounds, N.Y.C. Admin. Code § 8-107(28)(a) (2018). The term "undue hardship" refers to "an action requiring significant difficulty or expense, when considered in light of [certain enumerated factors]." 42 U.S.C. § 12111(a); see also N.Y.C. Admin. Code § 8-107(3)(b) (similarly defining the term as "an accommodation requiring significant expense or difficulty").

Under the ADA, when a plaintiff "suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." McMillan, 711 F.3d at 128 (citation omitted). Accordingly, under the ADA, a claim of undue hardship is an "affirmative defense, proof of which requires a detailed showing that the proposed accommodation 'would requir[e] significant difficulty or expense' in light of specific enumerated statutory factors." Rodal, 369 F.3d at 121

(alteration in original) (quoting Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 221 (2d Cir. 2001)). These factors include "the nature and cost of the accommodation," "the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation," and "the number of persons employed at such facility." 42 U.S.C. § 12111(10)(B)(i)-(iv).

The NYCHRL likewise "places the burden on the employer" to prove undue hardship as an affirmative defense, Jacobsen, 22 N.Y.3d at 835 (citing, inter alia, N.Y.C. Admin. Code § 8-107(15)(b)), and instructs courts confronting a claim of undue hardship to consider statutorily enumerated factors that are substantively identical to those utilized in the ADA context. Compare N.Y.C. Admin. Code § 8-102 (Reasonable Accommodation) with 42 U.S.C. § 12111(10)(B)(i)-(iv).

The NYSHRL takes a different approach, "requir[ing] the employee to show that the proposed accommodation is reasonable and would not cause the employer an undue hardship." Greenbaum v. N.Y.C. Transit Auth., No. 21-1777, 2022 WL 3347893, at *4 n.4 (2d Cir. Aug. 15, 2022) (citing N.Y. Exec. Law § 292 (21-e); Jacobsen, 22 N.Y.3d at 834-35).

**2. Analysis**

NYU Langone contends that Santiago's proposed accommodation of co-worker assistance "would . . . sacrifice[] the effectiveness of the [h]ospital's safety procedures" by requiring other ICU nurses to "aid [Santiago] in [the] performance of her essential duties." (Def. Sum. J. Br. (Dkt. No. 78) at 30) "The use of lifting machinery presents this same difficulty," "as another ICU Staff Nurse would need to step in and assist Plaintiff" to set up and use the equipment. This may not be practical in exigent circumstances, "such as a patient falling when attempting to ambulate." (Id.)

Defendant does not provide any citations to the record to support these factual assertions, however. (See id. at 29-30) Instead, it cites Abdelsayed v. New York University, 17-CV-9606 (VSB), 2023 WL 4705999 (S.D.N.Y. July 24, 2023), in which the court granted NYU Langone summary judgment on a doctor's NYSHRL and NYCHRL disability discrimination claims on grounds of undue hardship.

In Abdelsayed, Judge Broderick concludes that the plaintiff doctor's proposed accommodations posed undue hardships to the defendants' operation of NYU Langone because they would have "risk[ed] patient health and safety, particularly in emergency situations." Id. at *11 (citations omitted) (noting that plaintiff's proposed accommodations would have required "other employees to cover" for plaintiff).

Abdelsayed was the chief of gastroenterology at NYU Langone's Brooklyn facility, where he performed both "general procedures, such as . . . endoscopies," and "advanced procedures, including Endoscopic Retrograde Cholangio-Pancreatopgraphy ("ERCP")."[10] Id. at *1 (citations omitted) After Abdelsayed developed "several degrative musculoskeletal conditions," he told his supervisor that he was not certain that he could perform certain endoscopic procedures safely. Id. Abdelsayed's condition ultimately rendered him incapable of lifting heavy objects – such as endoscopes and certain equipment involved in administering ERCP – and caused him to experience severe pain after standing for prolonged periods. Id. at *2-3, 10-11.

Abdelsayed asked NYU Langone to allow him to continue working with certain accommodations, including "seating arrangement[s] . . . for prolonged procedures," and an

---

[10] ERCP is "a surgical procedure used in the treatment and diagnosis of pancreatic conditions." Roice v. County of Fulton, 803 F. App'x 429, 432 (2d Cir. 2020).

exemption from "perform[ing] any procedures that are inherently long and require the use of heavy equipment." Id. at *3. NYU Langone denied the request for accommodations. Id. at *2-3.

At summary judgment, NYU Langone offered evidence that the accommodations Abdelsayed sought would have posed an undue hardship to the hospital's ability to provide medical care safely. Id. at *11-12. As to his request to remain seated, the hospital offered evidence that emergencies arise during such procedures that would likely "necessitate that [Abdelsayed] be able to stand as needed." Id. at *11. Moreover, Abdelsayed was hired to perform "fluoroscopic procedures" such as ERCP, and was the only gastroenterologist on staff who was qualified to perform these procedures. Id. Accordingly, allowing Abdelsayed to opt-out of performing such procedures would leave the hospital entirely unable to perform ERCP and other complex fluoroscopic procedures. Id. Moreover, Abdelsayed had offered "virtually no rebuttal to these patient safety concerns." Id. (citations omitted). It was in this context that Judge Broderick concluded that Abdelsayed's proposed accommodations presented an undue hardship to NYU Langone.

Here – unlike in Abdelsayed – NYU Langone has not proffered any "'detailed showing that [either] proposed accommodation would require significant difficulty or expense.'" Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 543 (S.D.N.Y. 2009) (quoting Rodal, 369 F.3d at 121-22). Indeed, NYU Langone has not provided any citations to the factual record in support of its argument that Plaintiff's proposed accommodations would have posed an undue hardship. (See Def. Sum. J. Br. (Dkt. No. 78 at 29-30) "[W]ithout [such] concrete information, [this Court] cannot conclude as a matter of law that the burden was so disproportionately heavy as to absolve

[NYU Langone of] its reasonable accommodation obligations under the ADA[, the NYSHRL, and the NYCHRL]." See Rodal, 369 F.3d at 122.

Santiago, on the other hand, has proffered evidence suggesting that her proposed accommodations were reasonable and would not have caused undue hardship to NYU Langone. See Greenbaum, 2022 WL 3347893, at *4 n.4 (citations omitted) (noting that under the NYSHRL plaintiffs bear the burden on the undue hardship issue). In her declaration, Santiago says that her hospital employers have "assured [her] that assistive machinery or assistance from co-workers are available as reasonable accommodations" as she requires. (Santiago Decl. (Dkt. No. 92) ¶ 32) Moreover, Nurse Manager Wong testified that Santiago would have served on a team of "approximately 20 to 30 nurses," a fact suggesting that co-worker assistance would be readily available at little additional cost. (Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 115 (citing Buell Decl., Ex. 6 (Wong Dep.) (Dkt. No. 91-4) at 24, 27)) And the record also demonstrates that the ICU units in the Tisch-Kimmel Facility already contained many assistive lifting devices. (See Buell Decl., Ex. 22 (Orientation Packet) (Dkt. No. 91-20) at 20-29; Buell Decl., Ex. 23 (Equipment Inventory) (Dkt. No. 91-21)) In sum, there are material issues of fact as to whether Santiago's proposed accommodations would have caused NYU Langone undue hardship.

* * * *

For the reasons explained above, there are material issues of fact that preclude summary judgment on Santiago's ADA, NYSHRL, and NYCHRL disability discrimination claims. Accordingly, the parties' cross-motions for summary judgment on Plaintiff's disability discrimination claims will be denied.

## III. FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS AND COOPERATIVE DIALOGUE

The parties have cross-moved for summary judgment on Plaintiff's claim that NYU Langone failed to engage in an interactive process and cooperative dialogue with Santiago concerning her claim for a reasonable accommodation. (See Pltf. Sum. J. Br. (Dkt. No. 75) at 13-17; Def. Sum. J. Br. (Dkt. No. 78) at 31-33; see also Am. Cmplt. (Dkt. No. 26) at 9-10 (asserting that NYU Langone failed to (1) "engage in the interactive process in violation of the NYSHRL"; and (2) "engage in a cooperative dialogue in violation of the NYCHRL")) NYU Langone contends that it is entitled to summary judgment on Counts Four and Six to the extent that they assert that NYU Langone violated the NYSHRL and NYCHRL by failing to engage in an interactive process and a cooperative dialogue with Santiago. (See Def. Sum. J. Br. (Dkt. No. 78) at 31-33) Santiago opposes Defendant's motion (Pltf. Opp. (Dkt. No. 96) at 13-17) and argues that she is entitled to summary judgment on her sixth cause of action to the extent that it asserts a NYU Langone violated the NYCHRL by failing to engage in a cooperative dialogue. (Pltf. Sum. J. Br. (Dkt. No. 96) at 13-17)

### A. Failure to Engage in an Interactive Process under the NYSHRL

NYU Langone contends that Santiago cannot maintain a claim for relief under the NYSHRL based solely on Defendant's alleged failure to engage in an interactive process. (Def. Sum. J. Br. (Dkt. No. 78) at 31 (citations omitted) Santiago does not respond to this argument. (See Pltf. Opp. (Dkt. No. 96) at 13-17)

"There is no freestanding 'cause of action under the ADA or NYSHRL for a failure to engage in an interactive process.'" Baker, 805 F. Supp. 3d at 549 (quoting Greenbaum v. N.Y.C. Transit Auth., 2022 WL 3347893, at *5)). "While the presence of an interactive process may be 'introduced as evidence tending to show disability discrimination [under the

ADA or NYSHRL],' there is no independent cause of action for the failure to engage in an 'interactive process' under the ADA or NYSHRL, unlike the 'cooperative dialogue' claim under NYCHRL." Heiden v. N.Y.C. Health & Hosps. Corp., No. 20-CV-10288 (LJL), 2023 WL 171888, at *33 n.28 (S.D.N.Y. Jan. 11, 2023) (citations omitted).

Accordingly, NYU Langone is entitled to summary judgment on Santiago's fourth cause of action to the extent that it asserts an independent claim for failure to engage in an interactive dialogue under the NYSHRL.

**B. Failure to Engage in a Cooperative Dialogue Under the NYCHRL**

Santiago asserts that the undisputed material facts show "NYU [Langone] failed to engage in a cooperative dialogue . . . regarding potential accommodations of her disability." (Pltf. Sum. J. Br. (Dkt. No. 75) at 15-17)

**1. Applicable Law**

The NYCHRL provides that it is "an unlawful discriminatory practice for an employer . . . to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation . . . [r]elated to a disability." N.Y.C. Admin. Code § 8-107(28)(a)(2).

Under the NYCHRL, "cooperative dialogue" means

> the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity.

Hosking v. Mem'l Sloan-Kettering Cancer Ctr., 186 A.D. 3d 58, 65 (1st Dept. 2020) (quoting N.Y.C. Admin. Code § 8-102).

"[A]n employer's determination '"that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job . . . may only be made after the parties have engaged, or the [employer] has attempted to engage, in a cooperative dialogue."'" Ahmad v. New York Univ., No. 1:22-cv-01248 (JLR), 2025 WL 3022862, at *13 (S.D.N.Y. Oct. 29, 2025) (second alteration and omission in original) (quoting Lee v. N.Y.C. Fire Dep't, No. 24-cv-04772 (VMS), 2025 WL 2772855, at *4 (E.D.N.Y. Sept. 29, 2025) (quoting N.Y.C. Admin. Code § 8-107(28)(e)).

"[O]nce a defendant is on notice of a plaintiff's disability, it is required [by the NYCHRL] to engage in an interactive process with the employee in order to arrive at a reasonable accommodation." Cadet v. All. Nursing Staffing of N.Y., Inc., 632 F. Supp. 3d 202, 238 (S.D.N.Y. 2022) (citations, quotation marks, and alterations omitted). The NYCHRL envisions an "'interactive process that assesses the needs of the disabled individual and the reasonableness of the [potential] accommodation.'" Hosking, 186 A.D.3d at 62-63. That dialogue is to "'continue[] until, if possible, an accommodation reasonable to the employee and employer is reached.'" Id. at 63 (quoting Philips v. City of New York, 66 A.D. 3d 170, 176 (1st Dept. 2009))

While the NYCHRL requires that an employer and employee undertake this interactive process "in good faith," id., it "does not require an employer to 'give the employee what the employee is demanding.'" McSweeney v. Cohen, 776 F. Supp. 3d 200, 249 (S.D.N.Y. 2025) (quoting Hosking, 186 A.D.3d at 66). "'[T]he NYCHRL requires only that [employers] engage in an interactive process with the disabled individual; it does not require that the individual be satisfied with that process or that the process result in the individual's preferred accommodation.'" Baker, 805 F. Supp. 3d at 549 (alteration in original) (quoting Stuart v. T-

Mobile USA, Inc., No. 14-CV-4252 (JMF), 2015 WL 4760184, at *10-11 (S.D.N.Y. Aug. 12, 2015)).

In order to prevail on a claim under the NYCHRL for failure to engage in a cooperative dialogue, a plaintiff must demonstrate that:

(1) she "requested an accommodation" from the defendant or otherwise put the defendant on "notice" that she "m[ight] require such an accommodation" due to her disability, N.Y.C. Admin. Code § 8-107(28)(a)(2);

(2) the defendant is an "employer" under the NYCHRL, id. § 8-107(28)(a); and

(3) the defendant "refuse[d] or otherwise fail[ed] to," id., "engage in good faith in a written or oral dialogue" with the plaintiff "concerning the [plaintiff]'s accommodation needs [and] potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity." Id. § 8-102.

In considering claims brought under the NYCHRL, this Court is required to construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).

**2. Analysis**

As to the first element, it is undisputed here that Santiago "disclosed her disability and attendant [weight-]lifting restriction to both Iseman and Baniqued." (Pltf. Sum. J. Br. (Dkt. No. 75) at 5; see also Def. R. 56.1 Stmt. (Dkt. No. 77) ¶¶ 18-19 (noting Santiago's initial disclosure to Baniqued); Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 150-51 (documenting Santiago's subsequent disclosure of her revised weight-lifting restriction to Baniqued)) Accordingly, Defendant had "notice" that she would likely "require . . . an accommodation." See N.Y.C. Admin. Code § 8-107(28)(a)(2).

Moreover, NYU Langone does not dispute that it is an "employer" within the meaning of N.Y.C. Admin. Code § 8-107(28)(a) for purposes of Santiago's NYCHRL claim premised on a failure to engage in a cooperative dialogue. NYU Langone has not argued that it had no obligation to enter into a cooperative dialogue with Santiago because she had received only a conditional offer of employment.

As to the final element, Santiago argues that "no NYU [Langone] employee engaged her in a cooperative dialogue" concerning her accommodation needs. (See Pltf. Sum. J. Br. (Dkt. No. 75) at 14-17) In making this argument, Santiago relies on the deposition testimony of Iseman, Mellynchuk, and Wong. (Id.) Each testified that they never spoke with Santiago about how to accommodate her disability. (Pltf. R. 56.1 Stmt. (Dkt. No. 75) ¶ 179 (citations omitted))[11]

NYU Langone agrees that "[a]t no time prior to its recession of Santiago's offer of employment did anyone at NYU [Langone] – including Bruno, Wong, Iseman, [and] Mellynchuk – discuss with Santiago or any medical provider for Santiago, potential accommodations of her disability that could enable her to perform her responsibilities." (See Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 179)

NYU Langone nonetheless argues that it is not liable for failing to engage in a cooperative dialogue with Santiago. (Def. Sum. J. Br. (Dkt. No. 78) at 31-33; Def. Opp. (Dkt.

[11] During the physical examination, Baniqued asked Santiago whether she "believed she could perform '[her] duties with or without an accommodation' and [Santiago] responded 'yes[.]'" (Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 207 (first and third alterations in original) (quoting Collins Decl., Ex. 29 (Dkt. No. 89-1) at 186)) NYU Langone does not contend that this exchange constitutes a "cooperative dialogue" under the NYCHRL. Indeed, Defendant concedes that none of its employees had discussions with Santiago regarding "potential accommodations of her disability that could enable her to perform her responsibilities." (See Def. R. 56.1 Counterstatement (Dkt. No. 90) ¶ 179)

No. 88) at 14-18) According to Defendant, it engaged in a cooperative dialogue with Santiago by "openly communicat[ing] with [her] about her lifting restrictions and invit[ing] her to provide evidence that her lifting restriction was greater than thirty (30) pounds." (Def. Sum. J. Br. (Dkt. No. 78) at 31-32; see also Def. Opp. (Dkt. No. 88) at 14-17 (arguing that NYU Langone "interacted with Plaintiff regarding her accommodations" because Baniqued "twice request[ed] documentation of [Santiago's] lifting restriction" during the pre-employment physical examination process))

Defendant further argues that Santiago cannot recover for any failure to engage in a cooperative dialogue because she "tainted the cooperative dialogue process, thereby resulting in its obstruction." (Def. Sum. J. Br. (Dkt. No. 78) at 32-34 (citing Wallace v. Wormuth, No. 18-CV-6525 (RA), 2022 WL 993064, at *13 (S.D.N.Y. March 31, 2022)); see also Def. Opp. (Dkt. No. 88) at 14-17 ("Where an employee abandons or obstructs this interactive process, the dialogue is broken and recovery against the employer is precluded." (citing Romanello v. Intesa Sanpaolo S.p.A., 97 A.D. 3d 449, 450-51 (1st Dept. 2012), modified, 22 N.Y.3d 881 (2013))))

NYU Langone's first argument (see Def. Opp. (Dkt. No. 88) at 15 (stating that NYU Langone "interacted with Plaintiff regarding her accommodations, twice requesting documentation of her lifting restriction in accordance with its procedures")) is not persuasive. An employer does not satisfy its "cooperative dialogue" obligations under the NYCHRL merely by discussing with the employee the nature of the employee's disability and then requesting medical documentation regarding that disability. Employers must also communicate with the employee "concerning the person's accommodation needs; potential accommodations . . . ; and the difficulties that such potential accommodations may pose for the covered entity." N.Y.C. Admin. Code § 8-102.

Here, NYU Langone concedes that it never discussed potential accommodations with Santiago. Nor did it discuss the essential functions of the ICU staff nurse position with Santiago before rescinding her job offer. See Hosking, 186 A.D. 3d at 66 ("[T]he process has to be held in good faith and the essential functions of the position need to be part of the interactive process the law requires, not a unilateral employer decision cloaked by business judgement.") "This is a long way from the framework of cooperative problem solving based on open and individualized exchange in the workplace that the NYCHRL intended." See Rizzo v. N.Y.C. Dep't of Sanitation, No. 23-CV-7190 (JMF), 2024 WL 3274455, at *4 (S.D.N.Y. July 2, 2024) (citation and quotation marks omitted) (employer's request that an employee provide supplemental information regarding his disability, and employer's denial of accommodation without explanation and "in conclusory fashion," did not suffice to show that employer engaged in a cooperative dialogue under the NYCHRL); see also Heiden, 2023 WL 171888, at *34 (denying employer's motion for summary judgment where employer did not speak with employee regarding his request for accommodations before it denied his request).

The undisputed record here demonstrates that NYU Langone did not conduct a "cooperative dialogue" with Santiago about her disability and need for accommodations because it unilaterally determined that doing so would be futile. See Hosking, 186 A.D. 3d at 62-63.

On October 2, 2020 – the same day that Santiago disclosed her twenty-pound weight-lifting restriction – Wong, Bruno, and Mellynchuk discussed whether NYU Langone should rescind its offer of employment based on that restriction. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶ 43) Wong – the hiring manager for purposes of the ICU staff nurse position (id. ¶ 7) – stated that, given the weight restriction, there was no reasonable accommodation that would permit Santiago "to perform the essential functions of the ICU Staff Nurse position." (Id. ¶ 57)

Later that day, Mellynchuk began to draft a rescission letter based on this rationale. (Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 6-7 ("[Y]ou indicated that you are not able to lift more than 20 pounds. . . . After careful review and consideration, we are unable to accommodate this restriction. Lifting, pushing, and carrying patients and heavy equipment is an essential function of the Staff Nurse position. . . ."))

Santiago later told NYU Langone that she could lift as much as thirty pounds, and on October 5, 2020, Baniqued, Bruno, Iseman, Mellynchuk, and Wong discussed by email Santiago's revised thirty-pound weight-lifting restriction. (Def. R. 56.1 Stmt. (Dkt. No. 77) ¶¶ 60-65) Wong expressed the view that "a 30-pound restriction would cause similar issues" to those she previously identified concerning the twenty-pound restriction. (Id. ¶ 64 (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 4)) Wong also stated that even a thirty-pound weight restriction would result in an "undue hardship" for NYU Langone. (Id. ¶¶ 64-65) Bruno and Mellynchuk agreed that NYU Langone should rescind the offer of employment to Santiago despite the revised weight-lifting restriction. (Id. ¶ 65)

NYU Langone initially decided to delay recission of Santiago's offer until after it had received "'official documentation'" regarding Santiago's disability. (See id. ¶ 67 (quoting Collins Decl., Ex. 18 (Oct. 2, 2020 to Oct. 5, 2020 email thread) (Dkt. No. 76-18) at 2-3) (Bruno stating in October 5, 2020 email that formal rescission letter should be sent only after NYU Langone's Department of Occupational Health Services had received "the official documentation [regarding Santiago's] restrictions")); see also Collins Decl., Ex. 8 (Oct. 7, 2020 email thread) (Dkt. No. 76-8) at 2 (Bruno and Mellynchuk stating in October 7, 2020 email that NYU Langone should "give [Santiago] until [October 9, 2020] to produce documentation on any restrictions")) But after Santiago reported on October 7, 2020 that she could not see her neurologist until

October 27, 2020, Defendant decided not to wait until she submitted the requested documentation before rescinding Santiago's offer. On October 7, 2020, Iseman verbally notified Santiago that Defendant was rescinding its offer, and she sent Santiago a formal rescission letter later that day. (See Collins Decl., Ex. 22 (Oct. 7, 2020 email thread) (Dkt. No. 76-22) at 2-3 (Mellynchuk and Bruno directing Iseman to update the previously drafted rescission letter to include the revised lifting restriction and then transmit the letter "for the reasons previously discussed"); Pltf. R. 56.1 Stmt. (Dkt. No. 86) ¶ 176)

The undisputed facts thus demonstrate that NYU Langone never spoke with Santiago about any proposed accommodations before concluding that she was not fit to serve as an ICU staff nurse and rescinding her offer of employment. Accordingly, the "cooperative dialogue" required under the NYCHRL never took place.

NYU Langone argues, however, that Santiago cannot prevail on her claim because she obstructed the cooperative dialogue. Under the ADA, the NYSHRL, and the NYCHRL, a plaintiff "'who is responsible for the breakdown of [the] interactive process may not recover for a failure to accommodate.'" Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 794 (S.D.N.Y. 2020) (quoting Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945-46 (2d Cir. 2008)). Assuming arguendo that a similar rule applies in the context of NYCHRL claims for failure to engage in a cooperative dialogue – a proposition for which Defendant provides no authority[12] – Defendant has proffered no evidence suggesting that Santiago

[12] NYU Langone has cited no case holding that NYCHRL claims for failure to engage in a cooperative dialogue can be defeated by evidence that plaintiff obstructed that dialogue. The cases cited by Defendant (Def. Sum. J. Br. (Dkt. No. 78) at 32-33; Def. Opp. (Dkt. No. 88) at 14-16) arise solely in the context of failure to accommodate claims and almost entirely under Federal statutes and the NYSHRL. See Romanello, 97 A.D. 3d at 450-51 (addressing NYSHRL and NYCHRL claims for failure to accommodate); Strong v. Fernandez, 188 A.D. 3d 1590, 1590 (4th Dept. 2020) (NYSHRL claim for failure to accommodate); Wallace, 2022 WL 993064, at *13

obstructed a cooperative dialogue. As discussed above, NYU Langone never initiated or engaged in a cooperative dialogue with Santiago concerning her accommodation needs.

Because NYU Langone has proffered no evidence suggesting that it engaged in a cooperative dialogue with Santiago concerning her need for accommodations, Santiago's motion for summary judgment will be granted as to this issue, and NYU Langone' motion for summary judgment on this claim will be denied.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 73) is granted as to Plaintiff's claim for failure to engage in an interactive process under the NYSHRL, and is otherwise denied. Plaintiff's motion for summary judgment (Dkt. No. 74) is granted as to her claim for failure to engage in a cooperative dialogue under the NYCHRL, and is otherwise denied. Plaintiff's motion to strike the declaration of Naomi Noble (Dkt. No. 101) is granted. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 73, 74, 101) and to strike the Noble declaration (Dkt. No. 81) from the docket.

This case will proceed to trial at 9:30 a.m. on **October 26, 2026**, in Courtroom 705 of the United States Courthouse, 40 Foley Square, New York, New York. The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **October 5, 2026**. Responsive papers are due on **October 13, 2026**. The parties are directed to consult this Court' s

---

(Rehabilitation Act claim); Thompson v. City of New York, No. 98 Civ. 4725(GBD), 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9, 2002) (ADA claim); see also Atkins v. Walmart, Inc., 6:20-CV-1217 (ATB), 2022 WL 1320300, at *19 (N.D.N.Y. May 2, 2022) (ADA and NYSHRL claims); Jackson v. Elmhurst Hosp. Ctr., No. 10 Civ. 5248 (RRM), 2012 WL 868965, at *6 (E.D.N.Y. Mar. 14, 2012) (ADA claim).

Individual Rules as to the contents of their pretrial filings.

Dated: New York, New York
September 21, 2026

SO ORDERED

Paul G. Gardephe
United States District Judge